## AFFIDAVIT OF SPECIAL AGENT ROBERT J. WHITE

I, Robert J. White, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives, being duly sworn, depose and state as follows:

## INTRODUCTION

1. I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2. I have been a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) since 2002. I was previously employed as a United States Border Patrol Agent in Laredo, Texas. I am currently assigned to the OCDETF Strike Force, which investigates federal narcotics violations and criminal offenses, in the eastern portion of Massachusetts. Pursuant to my duties with the ATF and the Border Patrol, I have received training in state and federal firearms and drug laws, firearms trafficking, narcotics investigations, interdiction of narcotics and/or illegal proceeds, searches and seizures under the Fourth Amendment, asset forfeiture, and money laundering. In this regard, I know that it is a violation of 21 U.S.C. §§ 841 and 846 to conspire to distribute, and to distribute, controlled substances.

3. In the course of participating in investigations of drug trafficking, I have conducted or participated in surveillance, the undercover purchases of narcotics, the execution of search warrants, debriefings of subjects, witnesses, and informants and reviews of consensually recorded conversations and meetings. I have been the affiant on several Title-III applications and renewal applications. Pursuant to 21 U.S.C. §873, I was cross-designated in October 2015 to perform Title 21 law enforcement activities with respect to investigations of crimes described herein. Through my training, education, and experience, I have become familiar with the manner in which drug

traffickers conduct their illegal drug trafficking activity, to include their use of cellular telephones to contact drug customers, drug runners, drug associates, and sources of illegal drug supply. I am familiar with narcotics traffickers' methods of operation, including distribution, storage, and transportation of narcotics.

4. The information contained in this affidavit is based on my own investigation, oral and written reports by other law enforcement officers, physical surveillance, information from confidential informants/cooperating witnesses, public records, database checks, and other investigations. I make each of the following statements based upon my own personal knowledge, belief, and information and the knowledge, belief and information of other investigators involved in this investigation. The dates and times in this affidavit are approximate.

## PURPOSE OF AFFIDAVIT

5. This affidavit is being submitted in support of a criminal complaint against Elin Robinson Mejia ROMERO, a/k/a "Sixto Rivera," a/k/a "Memelo," a/k/a "Benito Rivera" (hereinafter, "ROMERO" or the "Defendant"), charging that beginning at least in or about January 2017 and continuing until the present, he did knowingly and intentionally possess with intent to distribute and distribute heroin, a Schedule I controlled substance, in violation of 21 U.S.C. §841(a)(1).

6. This affidavit is also being submitted in support of applications for search warrants for the following target locations, which are described in greater detail below and in attachments to the relevant warrant applications and warrants:

   (1) 20 Gordon Avenue, #2, Hyde Park, Massachusetts ("Target Location 1"), which is believed to be the residence of ROMERO. A full description of Target Location 1 is attached hereto as Attachment A, and is incorporated herein by reference.

(2) 943 Hyde Park Avenue, Third Floor Apartment, Hyde Park, Massachusetts ("Target Location 2"), which is believed to be a drug storage location used by ROMERO. A full description of Target Location 2 is attached hereto as Attachment A-1, and is incorporated herein by reference.

7. This affidavit does not set forth all the facts developed during the course of this investigation. Rather, it sets forth only those facts that are necessary and sufficient to establish probable cause to believe that the Defendant identified herein has committed the above-described controlled substance offenses and that evidence, fruits, and instrumentalities of these offenses will be found in Target Location 1 and 2 (collectively hereinafter, the "Target Locations") as described below.

## Probable Cause

8. The ATF and Drug Enforcement Administration ("DEA") began investigating the drug trafficking activities of ROMERO and Noelia Gonzalez (hereinafter, "Gonzalez") in January 2017, after a cooperating witness ("CW")[1] informed me that a person known to the CW as "Memelo" was selling heroin in the Boston area. The CW knew that Memelo previously had been deported from the United States to the Dominican Republic. The CW knew Memelo from the CW's own prior drug dealing. A DEA agent recognized the nickname "Memelo" from a previous drug investigation, and believed the person's name was Sixto Rivera. Homeland Security Investigations ("HSI") records indicated that Sixto Rivera's true name is Elin Robinson Mejia ROMERO, and that ROMERO had been deported from the United States to the Dominican

---

[1] The CW has been a documented and paid cooperating witness with the ATF for approximately two years. Prior to working with the ATF, the CW provided information to the Brockton Police Department. The information the CW has provided in this and other investigations has been reliable and corroborated by investigators. Information provided by the CW has led to arrests and drug seizures in other investigations. The CW has prior arrests and convictions, including for distribution of heroin.

3

Republic after a 2008 drug conviction in Boston federal district court.[2] As detailed below, investigators showed the CW a photograph of ROMERO, which the CW identified as being the person he knew as Memelo who had sold him heroin during the course of this investigation.

9. As detailed below, between January and June 2017, federal investigators have purchased more than 100 grams of heroin from ROMERO and his girlfriend, Gonzalez, over the course of five controlled purchases made by the CW. Prior to each purchase, the CW placed monitored and recorded calls to ROMERO requesting to purchase "fingers" of heroin. Based on my training and experience, I know the term "finger" is a slang term used to describe 10 grams of heroin, which is pressed into a cylinder shape. For four of the five controlled buys, Gonzalez either drove ROMERO to deliver the heroin or delivered it herself to the CW.

10. As detailed below, surveillance officers saw ROMERO and Gonzalez going in and out of Target Locations 1 and 2 before and/or after the controlled buys. Based on surveillance observations and the investigation to date, I believe Target Location 1 is the residence of ROMERO and Gonzalez, and that Target Location 2 is used by ROMERO and Gonzalez as a drug storage location. Based on facts known to me from this investigation and my training and experience, I believe that controlled substances, drug proceeds, records of drug dealing, phones used to conduct drug business, and materials used to package drugs will be found in Target Locations 1 and 2.

---

[2] A criminal database search revealed that ROMERO has a current outstanding state drug warrant under the alias name of Benito Rivera, with a date of birth of September 11, 1968. A criminal database check revealed that the photograph on the Massachusetts driver's license for Benito Rivera is in fact ROMERO's photograph.

**January 25, 2017: Controlled Purchase of heroin from ROMERO and Gonzalez**

11.     On January 24, 2017, at the direction of investigators, the CW called ROMERO and asked to purchase two fingers of heroin. ROMERO agreed and quoted the CW a price of $800 for the two fingers. This call was not recorded or monitored due to equipment failure. In a follow-up call on January 25, 2017, the CW again called ROMERO to arrange a meeting to purchase the two fingers of heroin. This call was recorded. ROMERO agreed to meet the CW at the corner of Blue Hill Avenue and Westview Street in Dorchester. Investigators searched the CW for contraband and gave the CW audio and video recording equipment and $800. Investigators then drove the CW to Dorchester. The CW got out of the car and walked to the corner of Blue Hill Avenue and Westview Street. At approximately 3:22 p.m., investigators saw a blue Ford Escape, bearing Massachusetts registration 584 ZD3 (hereinafter, the "Ford Escape"), pull up to the location where the CW was standing. The Ford Escape is registered to Julio Mejia, 943 Hyde Park Avenue, #3, Hyde Park, Massachusetts (which is Target Location #2). Investigators observed a Hispanic female, later identified as Gonzalez, driving the Ford Escape. The CW approached and got into the rear passenger seat of the Ford Escape. While inside the car, ROMERO gave the CW two fingers of heroin in return for the $800.

12.     Investigators followed the vehicle as it turned from Westview Street onto Stratton Street and observed Gonzalez still driving with a Hispanic male seated in the front passenger seat. After a short ride, the CW got out of the Ford Escape, which drove away. Investigators picked up the CW, who was on foot, and drove him to a predetermined location to debrief the CW. During the meeting, investigators retrieved and turned off the recording equipment and took custody of a clear plastic baggy containing what appeared to be two fingers of heroin. I again searched CW for

contraband and found nothing. The suspected heroin was sent to the DEA Northeast Laboratory, which confirmed that the substance was in fact 19.5 grams of heroin.

13. The CW told investigators that after he got into the Ford Escape, ROMERO, who was seated in the front passenger seat, handed him a bag of pastries. After a brief conversation, the CW gave ROMERO the $800, and ROMERO handed him a clear plastic bag containing two fingers of heroin. After a short ride, the CW got out of the car and then walked to the location to meet investigators. The CW's description of the encounter with ROMERO is consistent with the observations made by investigators and the recording of the conversation between ROMERO and CW.

**February 14, 2017: Controlled purchase of heroin from ROMERO and Gonzalez**

14. On February 14, 2017, the CW placed a recorded call to ROMERO at the direction of investigators to set up a controlled purchase of two fingers of heroin. ROMERO agreed to meet the CW at corner of Blue Hill Avenue and Westview Street, which is the same location from the January 25, 2017 controlled buy. Investigators searched the CW for contraband, and provided him with $800 and electronic audio and video recording equipment. Investigators drove the CW to Dorchester, and the CW waited for ROMERO on the corner of Blue Hill Avenue and Westview Street.

15. At approximately 1:20 p.m., Gonzalez arrived at the corner of Blue Hill Avenue and Westview Street driving the Ford Escape. ROMERO was in the front passenger seat. The CW got into the Ford Escape, which drove off. While in the car, ROMERO gave the CW two fingers of heroin in exchange for $800. Surveillance units followed the Ford Escape and saw the CW get out of the car after a short ride.

16. Investigators met the CW, drove him to a predetermined location, and took custody of the recording equipment and the two fingers of suspected heroin, which were wrapped in a napkin and elastic bands. The suspected heroin was sent to the DEA Northeast Laboratory, which confirmed the substance was a mixture of heroin and Fentanyl with a net weight of 19.6 grams.

17. After the CW got out of the Ford Escape, surveillance units followed it to 359 Park Street in Dorchester. Investigators saw ROMERO enter a residence while Gonzalez waited in the driver's seat. Several minutes later, ROMERO exited a residence in the area of 359 Park Street and got back into the front passenger seat of the Ford Escape, which then drove away. At approximately 2:05 p.m., surveillance officers saw a child get into the Ford Escape, which was stopped on Sheldon Street in Roslindale near a middle school. Surveillance officers followed the Ford Escape to 20 Gordon Avenue (Target Location 1). At approximately 2:16 p.m., investigators saw ROMERO get out of the Ford Escape and walk towards the side entrance of 20 Gordon Avenue in Hyde Park ("20 Gordon Avenue"). A records search indicates that the utilities for Target Location 1, which is apartment #2 located inside of 20 Gordon Avenue, are in the name of Noelia Gonzalez.

18. On February 21, 2017, investigators showed the CW two separate photo spreads, and the CW positively identified photos of ROMERO and Gonzalez as the individuals who sold him the heroin on January 25, 2017 and February 14, 2017.

**March 1, 2017: Surveillance of 20 Gordon Avenue, Hyde Park**

19. On March 1, 2017, at approximately 2:10 p.m., investigators conducting surveillance in the area of 20 Gordon Avenue, which is the location of Target Location 1, saw the Ford Escape parked in the driveway of the residence. At approximately 2:12 p.m., I observed ROMERO outside the residence on the sidewalk. At approximately 3:55 p.m., I saw

ROMERO and an unidentified teenage boy exit the side door to the residence. ROMERO entered the front passenger seat of the Ford Escape and the teenage boy sat in the back passenger seat. I then saw Gonzalez exit the same side door to the residence and get into the driver's seat of the Ford Escape. Investigators followed the Ford Escape to a soccer field on Reservation Road in Hyde Park, where ROMERO got out of the car with the unidentified teenage boy. Surveillance was ended at that time.

**March 8, 2017: Controlled Purchase of heroin from ROMERO and Gonzalez**

20. On March 8, 2017, at my direction, the CW called ROMERO requesting to purchase two fingers of heroin. ROMERO confirmed that he had the heroin and told the CW to call again when he was ready to meet. This call was not recorded. After the call, investigators established surveillance in the area of 20 Gordon Avenue.

21. At approximately 12:38 p.m., investigators saw ROMERO exit the left side door to 20 Gordon Avenue, rearrange trashcans, and then renter through the same side door. At approximately 12:40 p.m., investigators saw ROMERO get into the Ford Escape, which was parked in the driveway adjacent to 20 Gordon Avenue, and drive away. Investigators followed ROMERO as he drove to 943 Hyde Park Avenue, Hyde Park ("943 Hyde Park Avenue") and saw him park the Ford Escape in front of the residence. Target Location #2 is inside of 943 Hyde Park Avenue.

22. At approximately 1:03 p.m., the CW placed a recorded call to ROMERO to arrange to meet. ROMERO agreed to meet the CW at the same location as the previous controlled buys.

23. At approximately 1:21 p.m., investigators saw ROMERO exit 943 Hyde Park Avenue and get into the Ford Escape. Investigators followed ROMERO in the Ford Escape back

8

to 20 Gordon Avenue. Shortly thereafter, investigators saw Gonzalez leaving in the Ford Escape from 20 Gordon Avenue.

24. Investigators searched the CW for contraband, provided him with $800 and electronic audio and video recording equipment, and drove him to the area of Blue Hill Avenue and Westview Street. At approximately 1:37 p.m., Gonzalez and ROMERO arrived in the Ford Escape, and the CW got into the rear seat behind Gonzalez, who was driving.

25. Surveillance units followed the Ford Escape as it drove away. While in the car, ROMERO gave the CW the two fingers of heroin in exchange for $800. After a short distance, the Ford Escape stopped, and the CW got out. Agents picked up the CW and drove him to a prearranged location to meet with agents. At that time, I took custody of the two fingers of suspected heroin and the recording equipment. The suspected heroin was sent to the DEA Northeast Laboratory, which confirmed the substance was 19.9 grams of Fentanyl.

26. Investigators followed Gonzalez and ROMERO in the Ford Escape after they dropped off the CW. After stopping in the area of the Edward Brooks Charter School, the Ford Escape drove away from the school at approximately 2:09 p.m. and investigators followed the car back to 20 Gordon Avenue. Gonzalez and ROMERO got out of the Ford Escape and entered the left side door to 20 Gordon Avenue.

### May 2, 2017: Controlled Purchase of heroin from ROMERO and Gonzalez

27. On May 2, 2017, at my direction, the CW called ROMERO requesting to purchase two fingers of heroin. ROMERO confirmed that he had the heroin and told the CW to call again when he was ready to meet. This call was not recorded. After the call, investigators established surveillance in the area of 943 Hyde Park Avenue, where they saw the Ford Escape parked.

28. At approximately 12:31 p.m., the CW placed a recorded call to ROMERO to arrange to meet. ROMERO answered the call, and then handed the phone to Gonzalez to arrange the meeting with the CW. Gonzalez told the CW she would meet him at the same location as the previous controlled buys in half an hour.

29. Investigators searched the CW and his vehicle for contraband, provided him with $800 and electronic audio and video recording equipment, and followed him to the area of Blue Hill Avenue and Westview Street. At approximately 12:43 p.m., Gonzalez called the CW from phone number (857) 221-2615, and told the CW she was on her way. Gonzalez also told the CW to call her phone number to arrange for future heroin purchases.

30. At approximately 12:55 p.m., surveillance officers saw Gonzalez arrive at the intersection of Blue Hill Avenue and Westview Street driving a grey Chevrolet Equinox (hereinafter, the "Equinox"), bearing Massachusetts Registration 5YG 463. The CW got into the Equinox, which was parked in the parking lot of a convenience store. Investigators followed the Equinox as it drove away. While in the car, GONZALEZ gave the CW the two fingers of heroin in exchange for $800, and told the CW to call her directly on her cell phone to order heroin in the future. After a short distance, the Equinox stopped, and the CW got out. The CW was followed to a prearranged location. Once at that location, I took custody of the two fingers of suspected heroin, which was wrapped in a napkin inside a clear plastic bag, and the recording equipment. The suspected heroin was sent to the DEA Northeast Laboratory, but the laboratory results are still pending.

31. Investigators followed Gonzalez in the Equinox after she dropped off the CW. After losing the Equinox briefly in traffic, at approximately 1:10 p.m., investigators saw the Equinox parked in the driveway of 20 Gordon Avenue.

### June 6, 2017: Controlled Purchase of heroin from ROMERO

32. On June 6, 2017, at approximately 12:54 p.m., at the direction of investigators, the CW called ROMERO, but the call was not answered. Shortly thereafter, ROMERO called the CW back, and this call was recorded. The CW asked to purchase four fingers of heroin. ROMERO agreed and said he would meet the CW in twenty minutes at a Dunkin Donuts located in the area of 943 Hyde Park Avenue. Investigators searched the CW for contraband, provided him with $1,600 and electronic audio and video recording equipment, and followed the CW as he drove himself to the Dunkin Donuts.

33. At approximately 1:05 p.m., surveillance units observed ROMERO depart 20 Gordon Avenue driving the Equinox. Surveillance units followed the Equinox to the parking lot of the Dunkin Donuts, which is located across the street from 943 Hyde Park Avenue. ROMERO parked the Equinox and remained in the vehicle.

34. At approximately 1:20 p.m., ROMERO left the parking lot and drove the Equinox to 943 Hyde Park Avenue. ROMERO called the CW and told him he would have the heroin in fifteen minutes. At that time, investigators saw ROMERO get out of the Equinox and enter the front door of 943 Hyde Park Avenue.

35. At approximately 1:26 p.m., ROMERO exited 943 Hyde Park Avenue, walked across the street to the parking lot, and entered the Dunkin Donuts. At approximately 1:29 p.m., ROMERO called the CW and told him to meet him inside the Dunkin Donuts. Investigators watched as the CW got out of his own vehicle and entered the Dunkin Donuts.

36. Once inside, the CW sat at a table with ROMERO. The CW handed ROMERO the $1,600 under the table, and in return, ROMERO passed the CW under the table a clear plastic bag containing four fingers of suspected heroin, each of which was wrapped in white paper. The CW

then left the restaurant, got back into his car, and drove to a prearranged location to meet agents. Once at the location, I turned off the recording equipment and took custody of the four fingers of suspected heroin. The suspected heroin was later field tested, the results of which were positive for Fentanyl.

37. At approximately 1:33 p.m., surveillance units saw ROMERO leave the Dunkin Donuts and walk back to the Equinox, which was parked in front of 943 Hyde Park Avenue. ROMERO got into the Equinox and drove away. Surveillance units followed ROMERO to a middle school located in Roslindale. At approximately 2:05 p.m., ROMERO drove away from the school.

38. At approximately 2:14 p.m., surveillance units saw ROMERO arrive at 20 Gordon Avenue. A child exited the vehicle before ROMERO drove away. Surveillance units lost sight of ROMERO shortly thereafter.

## Target Locations

### A. *Drug Traffickers' Use of Residences Generally*

39. Based upon my training, experience, participation in other narcotics investigations, and extensive discussions with other law enforcement officers experienced in narcotics investigations, I am aware that it is generally a common practice for drug traffickers to store drug-related paraphernalia and records in their residences for longer periods of time than they keep drugs in their residences. I have participated in the execution of numerous search warrants of the residences of drug traffickers whose criminal activity is similar to that of the Defendant's. In a substantial number of residential searches executed in connection with the drug investigations in which I have been involved, drug related evidence has typically been recovered including cash, records, drugs, and other valuable items. Based on this experience and my training, I believe that:

a)	Drug traffickers often find it necessary to store large sums of cash received from the sale and distribution of controlled substances outside the normal banking system. Accordingly, narcotics traffickers frequently maintain large amounts of cash and other valuable assets at their residence in order to maintain and finance their ongoing business;

b)	Drug traffickers frequently maintain books, records, receipts, notes, ledgers, airline tickets, money orders, emails, and other documents relating to the transportation, ordering, sale and distribution of controlled substances and monetary instruments and other assets, and to debts and collections relating to monies owed or due for the distribution of controlled substances; and documents relating to the transportation of controlled substances, such as travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts.  Such documents may be maintained in paper or electronic form, and are generally maintained where the narcotics traffickers have ready access to them, including in cell phones and other electronic media capable of storing such information electronically, at locations such as their residences or other locations where they regularly conduct their drug business.  Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances.  Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers.  Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business.

I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises;

c) It is common for drug dealers to secrete records of drug transactions in secure locations within their cell phones, computers, residences, businesses, and/or other locations and devices over which they maintain dominion and control, for ready access and to conceal these items from law enforcement authorities;

d) It is common for significant drug traffickers to hide controlled substances, proceeds of drug sales (i.e., large amounts of currency, financial instruments, jewelry, safety deposit keys and deeds to real property), and records relating to controlled substances income and expenditures of money and wealth, such as money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, documents indicating travel in interstate and foreign commerce, and evidence of financial transactions relating to obtaining, transferring, hiding or spending large sums of money made from controlled substance trafficking activities in secure locations within residences, businesses, or other locations over which they maintain dominion and control, for ready access and to conceal them from law enforcement authorities;

e) Drug traffickers commonly maintain electronic and paper books or documents which reflect names, addresses, and/or telephone numbers of their associates in the trafficking organization, and other contact or identification data relating to the distribution of controlled substances. Such records and items are maintained where the traffickers have ready access to them, commonly on the traffickers' cell phone(s). They also tend to

maintain for long periods of time telephone billing records that evidence the placing of large numbers of calls each month in connection with narcotics dealing;

f)  Drug traffickers commonly have photographs of themselves, their associates, their property and their products in their possession or in their residences, and frequently maintain these photographs on their cell phone(s) and other electronic devices;

g)  Drug traffickers frequently maintain the items described above inside safes, key-lock strong boxes, suitcases, safe-deposit boxes and other containers, which are further secured by combination and/or key locks of various kinds in order to hide the contraband from other individuals living at or in the vicinity of their residence;

h)  Drug traffickers frequently build "stash" places within their residences or other locations in order to store illicit drugs as well as the items described above;

i)  Residents, whether drug traffickers or not, typically keep items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

40.  In my training and experience, I know that drug traffickers commonly use cellular telephones to communicate about and further their drug trafficking activities, but are aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and/or use multiple cellular phones at the same time, as well as prepaid cellular phones (where the subscriber of the phone is not required to provide personal identifying information), in an effort to thwart law enforcement's use of electronic surveillance. Based on my training and

experience, drug traffickers often use multiple phones and change their phone numbers frequently to avoid law enforcement detection. A cellular telephone is a handheld wireless device used for voice and text communication as well as for accessing the internet. Telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls and text messages made to and from the phone. In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities. These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device. Based on my training, experience, and research, I know that many cellular telephones have capabilities described above. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device as well as his criminal accomplices. I am also aware that drug traffickers often speak in vague, guarded, or coded language when discussing their illegal business in an effort to further prevent detection, and often use text messages in lieu of phone calls to avoid speaking over the telephone.

41.     Based upon all of the information I have obtained during the course of this investigation, and for the reasons more specifically set forth hereinafter, I believe the Defendant, like many drug traffickers, uses his residence in furtherance of his ongoing drug-trafficking

activities, and that, among other things, documentary and other evidence regarding those activities, including, but not limited to, the items set forth in Attachments B, will be found in Target Location #1.  *See e.g.*, *United States v. Feliz*, 182 F.3d 82, 87-88 (1st Cir. 1999).[3]

### B .   *Description of Target Location*

**(1)   20 Gordon Avenue, #2, Hyde Park, MA – Target Location #1**

Description of Target Location

42.     **20 Gordon Avenue, #2, Hyde Park, MA** is multi-family residence that has three apartments inside.  The utilities for Apartment #2 are listed in the name of Noelia Gonzalez. A detailed description of Target Location #1 appears in Attachment A, which is attached hereto and incorporated herein by reference.  This warrant also encompasses the vehicles associated with this location and investigation, specifically, a Ford Escape (MA Registration 584 ZD3) and a Chevy Equinox (MA Registration 5YG 463).  Based on the observations to date that are detailed herein, I believe that controlled substances, including heroin, Fentanyl, money, drug ledgers, phones used to conduct drug business, and the other items described in Attachment B will be found inside Target Location #1.

---

[3] In *Feliz*, the First Circuit made clear that, in the drug trafficking context, evidence of drug transactions can be expected to be found in a drug trafficker's residence for months after evidence of the last transaction. 182 F.3d at 87 ("[C]ourts have upheld determinations of probable cause in trafficking cases involving [three months long] or even longer periods") (citing *United States v. Greany*, 929 F.2d 523, 525 (9th Cir. 1991)(two year-old information relating to marijuana operation not stale)).  As the First Circuit has explained "[b]y its very nature, drug trafficking, if unchecked, is apt to persist over relatively long periods of time." *United States v. Nocella*, 849 F.2d 33, 40 (1st Cir. 1988).

**(2) 943 Hyde Park Avenue, Third Floor, Hyde Park, MA – Target Location #2**

<u>Description of Target Location</u>

43.  **943 Hyde Park Avenue, Third Floor, Hyde Park, MA** is a multi-family residence that has three apartments inside. Target Location #2 is the third floor apartment. The Ford Escape vehicle used by ROMERO and Gonzalez to deliver drugs, as detailed herein, is registered to Target Location #2 under the name Julio Mejia. The utilities for the other two apartments within 943 Hype Park Avenue are listed to individuals who have no known involvement in this investigation. A detailed description of Target Location #2 appears in Attachment A-1, which is attached hereto and incorporated herein by reference. Based on the investigation to date as detailed herein, I believe that controlled substances, in particular heroin, Fentanyl, money, drug ledgers, drug packaging materials, cell phones used to conduct drug transactions, and the other items described in Attachment B will be found inside Target Location #2, which is believed to be a drug storage location.

## CONCLUSION

44.  Based on the information set forth above, I believe probable cause exists to believe that ROMERO has engaged in violations of 21 U.S.C. §841(a)(1), namely, possession with intent to distribute, and the distribution of heroin, and that evidence of said criminal offenses, as set forth in Attachment B of each of the respective search warrant applications for the Target Locations, will be found inside each Target Location.

I, Robert J. White, having signed this Affidavit under oath as to all assertions and allegations contained herein, state that its contents are true and correct to the best of my knowledge, information, and belief.

_____
ROBERT J. WHITE
ATF SPECIAL AGENT

Subscribed and sworn to me this the 7th day of June 2017.

_____
HONORABLE JENNIFER C. BOAL
UNITED STATES CHIEF MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS